Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, INDEPENDENT, and William V. Bradley, Its President, and Patrick J. Connolly, Its Executive Vice President and Chairman of its Wage Scale Committee, Atlantic Coast District, Respondents-Appellants.

No. 252, Docket 24446.

United States Court of Appeals
Second Circuit.

Argued Jan. 17, 1957.

Decided Feb. 4, 1957.

Waldman & Waldman, New York City
(Louis Waldman, Seymour M. Waldman
and Martin Markson, New York City, of
counsel), for respondents-appellants.

Kenneth C. McGuiness, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, and Joseph I. Nachman, Atty., National Labor Relations Board, Washington, D. C., for petitioner-appellee.

Before MEDINA and HINCKS, Circuit Judges, and LEIBELL, District Judge.

MEDINA, Circuit Judge.

On August 1, 1956, the International Longshoremen's Association, Independent, and the New York Shipping Association began to negotiate a new collective bargaining agreement to replace a two-year agreement which was due to expire on September 30 of that year. The old agreement covered only employees in the Port of Greater New York and vicinity; and the ILA, as the Longshoremen's Association is commonly called, demanded that this bargaining unit be extended to include almost all ports from Portland, Maine, to Brownsville, Texas.

One day before this bargaining began, the International Brotherhood of Longshoremen (AFL) filed a petition with the National Labor Relations Board for a new election to determine whether it or the ILA should be certified as the exclusive bargaining representative of the employees in the Greater New York unit. The ILA also petitioned the Board to change the bargaining unit so that it would not be limited to Greater New York, but would include almost all the Atlantic and Gulf Coast ports of the United States.

The Board disposed of these matters in an opinion dated September 24, 1956. 116 N.L.R.B. No. 157. It confined "the scope of the appropriate unit * * * to the Port of Greater New York and Vicinity," as it had done in 1953, and ordered an election by secret ballot to determine whether the ILA or its rival union should be certified as the representative of employees in that unit. The election was held on October 17, 1956 and resulted in a vote in favor of the ILA.

On October 25, 1956, the Board again certified the ILA as the representative for collective bargaining of the employees in the Greater New York area, which it had found one month earlier to be the appropriate bargaining unit.

During these proceedings, the ILA and the Shipping Association continued to meet in order to arrange a new agreement and the ILA continued to demand an enlargement of the bargaining unit. The Association objected to any change in the unit of bargaining and on October 23, 1956 filed the following charge against the ILA with the National Labor Relations Board:

On various dates, including October 22, 1956, September 4, 1956, and August 1, 2, 9 & 27, 1956, Respondents, labor organizations and agents thereof, being representatives of the Employer's employees subject to section 9(a) of the Act, have refused and continue to refuse to bargain collectively with the Employer in good faith by insisting that the latter, which is authorized to bargain only for employers employing employees in the Port of Greater New York and vicinity, bargain with them for all employees engaged in longshore work in all ports from Portland, Maine to Brownsville, Texas when the appropriate unit for bargaining as found by the Board in Case No. 2–RC–8388, 116 NLRB No. 157, (Sept. 24, 1956) is the Port of Greater N. Y. and vicinity and by refusing to discuss or negotiate with the employer terms and conditions of employment to be applied to longshore employees in the Port of Greater New York and Vicinity.

Though this charge was filed, the parties met frequently and for long sessions until the negotiations reached an impasse on November 15 and a strike was called by the ILA in all Atlantic and Gulf Coast ports. On November 21, having investigated the charge filed by the Association one month earlier and having issued a complaint, the Board petitioned the District Court for a tempo-

rary injunction pursuant to Section 10 (j) of the National Labor Relations Act. It is from the order granted by the District Court, enjoining the ILA from insisting on a change in the bargaining unit found appropriate by the Board, that this appeal is taken.

The questions raised on this appeal deal with each of the three steps required by Sections 10(b) and 10(j) [1] before a District Court may issue a temporary injunction. The first step is the filing of a "charge" by a party alleging that some person has engaged in or is engaging in an unfair labor practice. The second step is the issuance of a "complaint" by the National Labor Relations Board, "stating the charges in that respect." The third step is a hearing by the District Court to determine: (1) if there is reasonable cause to believe that the certain labor practice stated in the complaint was committed; and (2) if, under these circumstances, a temporary injunction would be "just and proper."

The appellants argue (1) that the "charge" failed to allege an unfair labor practice; (2) that the "complaint" in any event failed to state the charge "in that respect"; and (3) that the court had no power to issue an injunction here. These arguments, we note, were considered and rejected by Judge Bryan in his scholarly and comprehensive opinion, 147 F.Supp. 103.

## I

The "charge" alleged that the ILA was the "representatives of the Employer's employees subject to Section 9 (a) of the Act" and, by implication, that the ILA was thus under a duty to bargain in good faith. It also alleged that on various days between August 1 and October 22, 1956, the ILA insisted that the Association "bargain with them for all employees engaged in longshore work in all ports from Portland, Maine to Brownsville, Texas" after the National Labor Relations Board had decided that the appropriate unit for bargaining was the Port of Greater New York and vicinity. We hold that these allegations "charged" an unfair labor practice, within the meaning of Section 8(b) (3).

This conclusion is required by the logic of the National Labor Relations Act. Section 1 declares that the policy of the Act is to prevent obstructions on the free flow of commerce "by encouraging the practice and procedure of collective bargaining." To effectuate this policy, Section 7 protects the employees' right "to bargain collectively through representatives of their own choosing" and Section 8(a) (1) makes it an unfair labor practice for an employer to interfere with that right. Moreover, Section 8(a) (5) declares that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)"; and Section 8(b) (3) similarly declares that it is an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a)."

Section 9 fixes the framework within which labor and management are required to bargain and explains the earlier references to this section. Under Section 9(a), "Representatives designated or selected for the purposes of collective bargaining by the majority of the

---

1. Section 10(j) provides:
"The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition [the proper] district court of the United States * * * for appropriate temporary relief or restraining order. Upon the filing of any such petition the court * * * shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper."
Section 10(b) provides:
"Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *."

employees in a unit appropriate for such purposes" are the exclusive representatives "of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." Section 9(c) authorizes employers and employees to petition the National Labor Relations Board to determine the representatives designated or selected for the purposes of collective bargaining by a majority of the employees in a unit appropriate for such purposes, as required by Section 9(a). Finally, the Board is directed by Section 9(b) to decide in each case the unit appropriate for such purposes.

█ We think a clear pattern is implicit in these statutory provisions. The statute imposes on labor and management alike a duty to bargain in good faith with respect to wages, hours and other conditions of employment in the expressed belief that such bargaining is the most effective way to settle differences without disrupting commerce. This duty "does not compel either party to agree to a proposal," as Section 8(d) states, "or require the making of a concession," and the Board has no power to settle any of those questions. By way of contrast, it not only has power, but is indeed directed, to decide what is the appropriate bargaining unit in each case.

█ This distinction between private bargaining over conditions of employment and administrative determination of the unit appropriate for bargaining is clear. The parties cannot bargain meaningfully about wages or hours or conditions of employment unless they know the unit of bargaining. That question is for the Board to decide on a petition under Section 9(c) of the Act, and its decision is conclusive on the parties, cf. Brown, for and on behalf of N. L. R. B. v. Pacific Tel. & Tel. Co., 9 Cir., 218 F.2d 542, 544, although the decision may subsequently be changed.

The machinery for initial decision and subsequent change is provided in the statute. On a petition by an employer, an employee, or a labor organization under Section 9(c), the Board decides after a hearing what the appropriate bargaining unit is. This decision may be altered at a later time on a new petition to the Board. Past experience has demonstrated that the Board on occasion has done this.[2] It may be altered by the Board if, in a proceeding to enforce or set aside an order issued by the Board, a Court of Appeals finds the Board's determination not supported by substantial evidence on the record as a whole and declines to enforce or sets aside the order based on that determination. Finally, it may be altered by agreement of the parties, if the process of alteration involves no disruption of the bargaining process or obstruction on commerce and if the Board does not disturb the agreement in a subsequent representation proceeding. Lever Bros. Co., 96 N.L.R.B. 448; Owens-Illinois Glass Co., 108 N.L.R.B. 947. In these situations, the process of change is contemplated by the Act and is obviously consistent with its policy of avoiding obstructions on the flow of commerce by encouraging collective bargaining. And the Board, which is directed on a petition to decide in each case the appropriate bargaining unit, retains control of the changes made.[3]

2. For an interesting example, compare Savannah Electric & Power Co., 48 N.L.R.B. 33, 36–38, with Savannah Electric & Power Co., 38 N.L.R.B. 47, 49–53.

3. That this control is more than a matter of form, see Lever Bros. Co., 96 N.L.R.B. 448, 449–50: "Unlike the situations involved in the cases cited in the Petitioner's brief where actual changes occurred in the composition of the Board-certified unit [Savannah Electric and Power Co., 48 N.L.R.B. 33; The Mathieson Alkali Works, 51 N.L.R.B. 113], here the contracting parties merely achieved a merger of a smaller unit into a larger group which has a strong community of interests in the subject matter of collective bargaining, such as the Board customarily finds an appropriate unit." See, also, for a more elaborate appraisal of a privately-agreed upon unit, Owens-Illinois Glass Co., 108 N.L.R.B. 947.

The process of change not permitted by the Act is one that denies the Board this ultimate control of the bargaining unit and disrupts the bargaining process itself. This is precisely what occurs when, after the Board has decided what the appropriate bargaining unit is, one party over the objection of the other demands a change in that unit. Such a demand interferes with the required bargaining "with respect to rates of pay, wages, hours and conditions of employment" in a manner excluded by the Act. It is thus a refusal to bargain in good faith within the meaning of Section 8 (b) (3).

This is the unfair labor practice alleged in the "charge" filed by the Shipping Association, and we turn now to consider whether the Board issued "a complaint stating the charges in that respect."

## II

The dates specified in the "charge" included August 1, 2, 9 and 27, September 4 and October 22, 1956. Judge Bryan proceeded "upon the assumption that there was no duty to bargain" on the dates just mentioned or, indeed, on October 23, when the charge was filed, doubtless because the question of representation raised and formulated on July 31 was not resolved until October 25, when the ILA was certified as the representative for employees in the Port of New York and vicinity, a fact known to the Board when it issued its complaint on November 21, 1956. We agree that the question of whether or not there was a duty to bargain on the date when the "charge" was filed need not be decided and we do not now decide it.[4]

The complaint alleged in paragraph 9 thereof that the respondents refused to bargain in good faith by insisting that the Shipping Association "engage in collective bargaining with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment affecting employees in various ports of the United States on the North Atlantic Coast, rather than with respect to pay, wages, hours of employment, and other terms and conditions of employment affecting employees in the appropriate unit [The Port of Greater New York and vicinity]." It also alleged that the respondents induced a strike to compel such bargaining. The dates specified included, in addition to those in the "charge," October 25, 26, 29 and 30 and November 7-15, 1956.

■ If we assume, *arguendo*, as above stated, that the ILA was under no duty to bargain on the date when the "charge" was filed, and if the complaint specified only the dates contained in the "charge," this petition would fail. In such case we turn to the question whether a complaint, by stating facts subsequent to the filing of a "charge" valid on its face, which demonstrate a duty to bargain at the time of the formulation of the complaint, satisfies the statutory limitation that the Board issue "a complaint stating the charges in that respect." We think it does.

■ This question and the answer we have given require some understanding of the functions of the complaint issued by the Board and of the "charge" filed by a party. The complaint, much like a pleading in a proceeding before a court, is designed to notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing. Thus, Section 10(b) authorizes the Board to amend the complaint and it permits the "person so complained of * * * to file an answer to the original or

4. Judge Bryan has noted in footnote 2 to his opinion the contentions of the Board that an unfair labor practice could still have been committed between August 1, 1956 and October 22, 1956, the period encompassed in the charge as filed by the employer, i. e., "(1) even though no duty to bargain existed, once the parties decided to negotiate, they were obligated to negotiate in good faith for the certified unit" and "(2) while the ILA was not certified by the Board as the bargaining representative until October 25, 1956, the election results which resulted in victory for the ILA were known on October 20, 1956, at which time the parties were under a duty to bargain."

amended complaint." And Section 10(c), recognizing the central role of the complaint, declares that if by a preponderance of the evidence "the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice," it shall state its findings of fact and issue a cease and desist order "requiring such person to cease and desist from such unfair labor practice."

The "charge" has a lesser function. It is not designed to give notice to the person complained of or to limit the hearings or to restrict the scope of the final order. It serves *in limine* the function of drawing the Board's attention to a cause for economic disturbance, not abstractly or in an area not within the jurisdiction of the Board, but by alleging that some person has engaged in or is engaging in one of the unfair labor practices defined in Sections 8(a) and (b) of the Act. This done, the only relation required between the "charge" and the "complaint" is that the complaint deal with "the same class of violations as those set up in the charge and [be] continuations of them in pursuance of the same objects." National Licorice Co. v. N. L. R. B., 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799. In short, the "charge" must allege the unfair labor practice to invoke the jurisdiction of the Board; and, by way of limitation, the complaint issued by the Board must deal with the same subject matter and sequence of events, N. L. R. B. v. National Licorice Co., 2 Cir., 104 F.2d 655, 658, although the specific events stated in the complaint may precede or follow those stated in the "charge."

The cases may be understood in terms of this distinction. The courts and the Board have required that the "charge" allege an unfair labor practice. In N. L.

R. B. v. Vare, 3 Cir., 206 F.2d 543, for example, the court declined to enforce an order because the "charge" failed to allege an unfair labor practice: from the face of the "charge" it was clear that the person complained of was not in interstate commerce. And the Board similarly dismissed the complaint in Mid-States Steel & Wire Co., 112 N.L.R.B. 800, and New York Shipping Association, 112 N.L.R.B. 1047, because the allegations in the "charges" referred to events that occurred more than six months prior to the date on which the "charges" were filed.[5]

These cases indicate that the statutory phrase "Whenever it is charged that any person has engaged in or is engaging in any [Section 8] unfair labor practice" means that no complaint may issue if, when all the facts alleged are assumed to be true, they would not constitute an unfair labor practice.

Other cases deal with the relation between the "charge" and the "complaint."[6] In N. L. R. B. v. Harris (Union Manufacturing Co.), 5 Cir., 200 F.2d 656, the court dealt with violations that occurred after the filing of the last amended charge, but before the issuance of the complaint. Holding that the Board had jurisdiction over those later violations, the court noted, at page 658, "The charge having set in motion the Board's inquiry, the complaint properly included matters occurring subsequent to the filing of the charge * * *." Similar holdings are listed in footnote 6.

Here, the "charge" alleged the unfair labor practice of refusing to bargain in good faith and thus set in motion the Board's inquiry. The complaint issued by the Board dealt with "the same class of violation and was a continuation of it in pursuance of the same object." And we hold, for reasons discussed in con-

5. There is no need to decide now if our decision in N. L. R. B. v. A. E. Nettleton Co., 241 F.2d 130, where we held that the six month proviso of Section 10(b) "does not impose a jurisdictional limitation upon the Board, but is a statute of limitations" that may be waived, would require a different ruling in the two cases just cited.

6. National Licorice Co. v. N. L. R. B., 309 U.S. 350, 367–369, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Kohler Co., 7 Cir., 220 F.2d 3, 7; N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144, 149.

nection with the allegations in the "charge," that it asserted the commission of an unfair labor practice and that the Board therefore had authority by petition to invoke the jurisdiction of the District Court.

### III

The record made in the District Court clearly demonstrates that there was reason to believe that appellants were engaging in the unfair labor practice stated in the complaint and on this record we are convinced that the District Judge did not abuse his discretion in finding it "just and proper" to grant the temporary injunction. Appellants contend nevertheless that the court was powerless to issue the injunction because of Section 13 of the National Labor Relations Act. That section declares:

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike * *."

This argument is without merit. Section 10(j) "specifically provided" for a temporary injunction on petition by the Board when there is reasonable cause to believe the unfair labor practice complained of was committed. That is the situation here.

Affirmed.