Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

COMPRESSED AIR, FOUNDATION, TUNNEL, CAISSON, SUBWAY, COFFERDAM, SEWER CONSTRUCTION WORKERS, LOCAL NO. 147 OF NEW YORK, NEW JERSEY STATES AND VICINITY, AFL-CIO, Respondent-Appellant.

No. 425, Docket 27020.

United States Court of Appeals Second Circuit.

Argued June 20, 1961.

Decided July 11, 1961.

---

I. Philip Sipser, New York City (Paul O'Dwyer and John S. Williamson, Jr., New York City, on the brief), for respondent-appellant.

Winthrop A. Johns, Asst. Gen. Counsel, N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Jacques Schurre, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner-appellee.

Before CLARK and SMITH, Circuit Judges, and DAWSON, District Judge.

DAWSON, District Judge.

This is an appeal from an order of the United States District Court for the Eastern District of New York (Bartels, D. J.) granting an injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C.A. § 160(j).[1]

Section 10(j) authorizes the National Labor Relations Board (hereinafter called "the Board"), upon issuance of an unfair labor practice complaint, to petition a United States District Court for appropriate injunctive relief. The court is empowered to grant "such temporary relief or restraining order as it deems just and proper." A prerequisite to the granting of such relief is a finding by the District Court that reasonable cause exists to believe that a violation of the Act, as charged, has been committed. The District Court does not have to determine whether, in fact, the violation has been committed; the determination with respect to this question is reserved to the Board, subject to review by the courts of appeals.

On appeal from the District Court this court is limited to the question of whether the District Court was, or was not, reasonable in concluding that the Regional Director had cause to believe that the charges were true. Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534. See also, Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 241 F.2d 278.

The unfair labor practice charged herein is that appellant, in violation of section 8(b) (3) of the Act (which section requires unions to bargain collectively with employers), went on strike against

---

1. The order enjoined the union from striking or inducing a strike "for the purpose of modifying or terminating its collective bargaining agreement with Catapano-Grow" without first complying with the requirements of section 8(d) of the National Labor Relations Act.

the charging party for contract changes during the term of contract and without first giving the federal and state conciliation services 30 days notice of the contract dispute. Section 8(d) of the Act provides in part:

" * * * where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

\*    \*    \*    \*    \*    \*

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later."

The essential facts in the present case are not in controversy. It appears that Andrew Catapano Company, Inc. and Grow Construction Company, Inc. (hereinafter called "C–G"), the charging party, is a joint venture engaged principally in constructing sewers, tunnels, highways and related projects. A contract between appellant and C–G was executed in 1957 and modified in 1958 and 1959. It provided that the contract was to continue in effect until the completion of a job in connection with the construction of a sewer for the City of New York on Kent Avenue, Brooklyn, unless terminated prior thereto pursuant to a clause permitting the contract to be reopened as to wages prior to June 1, 1960.

On or about May 25, 1960, appellant served written notice on C–G and other employers in the industry of its desire to commence joint wage negotiations. The notice invoked the reopening clause of the contract. Several meetings were held by the parties, but no agreement was reached. In one of the meetings the union proposed the execution of a contract identical with the contract between appellant and Poirier & McLane (the P–M contract) which contained many provisions relating to conditions other than wages. C–G refused to execute such a contract.

Thereupon on February 28, 1961, the union informed C–G that unless the P–M contract was signed, work on C–G's Kent Avenue sewer project, then manned by employees of the union, would stop "for lack of a contract." Two further meetings were held in March 1961. On April 3, 1961, a further meeting was held between the union and C–G. At that meeting appellant's business agent and its president stated that their position was that the P–M contract, if signed, would apply to the work then in progress on the Kent Avenue sewer.[2] When the pro-

2. The testimony of Mr. Boyle, Chairman of the Union Negotiating Committee was as follows:

"Q. Was it the position of Mr. Murphy and Mr. Finney [president and business agent of the union], when this contract was signed, upon the signing of that contract, that that P–M contract was to apply to the construcion work then in progress for the City in this Kent Avenue sewer? A. Yes."
And later—
"Q. And was that contract [the P–M contract] to take the place of the existing contract? A. It took the place of all the contracts, yes."

posal for the adoption of the P–M contract was not accepted, the union ceased work on the Kent Avenue sewer, informing C–G by telegram that the stoppage was the result of "lack of a contract." No notice was sent to the Federal Mediation and Conciliation Service or the New York State Mediation Board. The City of New York, by telegram, informed C–G that failure to finish the concreting of the tunnel had resulted in an unsafe condition in respect to water mains, sewers and power cables in the street.

█ The issue between the parties is whether there was an attempt to modify or terminate an existing contract, or whether, on the contrary, the negotiations concerned a contract for future work and hence was not subject to the requirements of section 8(d). If appellant's conduct was solely for the purpose of negotiating a new contract for future work, without affecting the terms and conditions of the existing contract relating to the Kent Avenue sewer, such conduct could not be proscribed as an unfair labor practice since it did not deal with the termination or modification of an existing agreement.

However, the court below found from the testimony that the union, on April 3, 1961, insisted upon the immediate execution of the P–M contract, the terms of which would apply to the work covered by the existing agreement. The court found that in the negotiations arising out of the wage reopening clause discussions of wages became coupled with negotiations as to terms and conditions of a superseding contract, and at no time was there considered a modification of the existing agreement with regard to wages alone. The court found that the procedure for modification of the contract was invoked, but modification was never effected, and on April 3, 1961, the union demanded the acceptance of the P–M contract as a condition of continuation of work on the Kent Avenue sewer.

The court therefore concluded that the Regional Director had reasonable cause to believe that the work stoppage was not for the purpose of compelling the execution of a new contract to cover future work, but was a work stoppage arising out of a dispute over the modification of an existing agreement. If this was so, then there was a violation of the Act, since the mediation agencies were never informed by appellant of the existence of a dispute as to modification of the existing contract and hence reasonable cause existed to believe that there was a failure to bargain in good faith, within the meaning of section 8(d), constituting an unfair labor practice which justified the action of the Regional Director.

The action of the union was obviously an attempt to replace the terms of a current agreement with the terms of the P–M contract. Such attempt to modify the current contract was an attempt to supersede the current contract by the new P–M contract. Whether the union was seeking a "modification" or "termination" of the existing contract is a matter of semantics. The operative facts were the same in either case. When the union informed the charging party that unless the P–M contract was executed work on the current project would stop for lack of a contract, it clearly indicated that it intended to modify the contract then in existence. There was no lack of a contract, for admittedly the contract covering the Kent Avenue sewer was then in effect. Under the circumstances the Regional Director had good cause to believe that there had been a violation of the Act. The court was justified in concluding that the Director had cause to believe that the charges made before him were true. The court was also justified in believing that the issuance of a temporary injunction was necessary for the protection of the public interest and for the preservation of the status quo.

Affirmed.