NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL UNION OF OPERAT-
ING ENGINEERS, LOCALS 542, et
al., Respondents,

York County Bridge, Inc., Intervenor.

No. 75–1307

United States Court of Appeals,
Third Circuit.

Argued January 8, 1976

Decided March 19, 1976.

As Amended April 7, 1976.

Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Alan D. Cirker, Roger T. Brice, Washington, D. C., for petitioner.

Abraham E. Freedman, Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa., for respondents.

Earle K. Shawe, Carroll Hament, John S. Williamson, III, Warren M. Davison, Shawe

& Rosenthal, Baltimore, Md., for intervenor.

Before VAN DUSEN, ADAMS and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Because the means selected were not tailored to the statutory pattern, the National Labor Relations Board cut off the efforts of a trade union to eliminate what it termed the "double-breasted operation" of a contractor. The Board directed the local union to bargain with a subcontractor without insisting on certain contractual clauses designed to limit the sources from which the employer could obtain construction equipment. An alternate approach, the Local's endeavor to enlarge its representation at the expense of a rival union through improper bargaining with the employer, was also prohibited. We will enforce the Board's order.

York County Bridge, Inc. is a subcontracting firm engaged principally in pile driving and bridge construction and is a wholly-owned subsidiary of G. A. and F. C. Wagman, Inc. Wagman is also in the construction business. For many years its employees have been represented by District 50, Allied Technical and Construction Workers which later merged with the United Steelworkers.

Wagman was unable to secure subcontracts where the general contractor was required under its collective bargaining agreement to sublet only to employers whose workmen were represented by an AFL–CIO building trade union. To meet this situation, in 1960 Wagman incorporated the York Company which adopted the policy of securing labor through building trade union hiring halls.

In 1967, York joined the Contractors Association of Eastern Pennsylvania (CAEP), a multi-employer group, and thereby became a party to a collective bargaining agreement with Local 542 of the Interna-

tional Union of Operating Engineers.[1] When that contract expired in 1971, Local 542 advised CAEP that York and several other contractors would be "carved out" of bargaining for a new agreement because they were "dual companies."[2]

The union considered the "dual companies," such as York-Wagman, a threat to job opportunities for Local 542 members and submitted contractual provisions to CAEP which were designed to resolve the problem. The union proposals were designated as Section 11 of a new contract:

"Section 11—Non-Union Equipment:

(a) No operator shall be required to operate equipment belonging to a contractor or supplier with whom this Local Union is not in signed relations, provided, Union equipment is available in the locality. No party to this agreement shall rent or supply equipment unmanned to anyone doing construction work covered by this agreement who is not in signed relations with this Union.

(b) No employee represented by this Union on construction work shall be required to operate equipment of or for any Employer who has any interest in a firm or company doing construction work within the jurisdiction of this Union and which is not in signed relations with this Union."

When no agreement had been reached by May 1, 1971, the union went on strike and its members did not return to work until July 13, 1971. On the next day, representatives of the "carved out" employers, including York, who were still struck, met with the union negotiators. The Local advised that not only would the "carved out" employers have to sign the standard contract but, in addition, they would be required to discuss some additional problems. York was told that it would have to end its dual operation within a period of time to be negotiated, and until agreement was reached, Local 542 would not furnish workers.[3]

During September and October of 1971, York stated that it would sign the standard contract but refused to bring Wagman "under the map of the agreement." Upon the union's refusal to accept this condition, a complaint was filed before the N.L.R.B. in which York alleged that it was being coerced to enter into a contract prohibited by Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).

The administrative law judge found that the union's object was to compel York-Wagman to employ only Local 542 members, a result which he did not believe was in violation of the Act, and dismissed the complaint. The Board reversed, finding that the union's object was to force York's agreement to Section 11 of the standard contract, a provision which was prohibited by Section 8(e). Moreover, the Board held that the union had failed to bargain as required by the Act. One member of the three-man panel dissented.

The Board ordered the union to bargain with York and to desist from requiring the employer to enter into a prohibited agreement or insisting that the agreement cover the Wagman employees currently represented by another labor organization. We are asked to enforce the order.

The union asserts, *inter alia*, that the case is moot because the standard contract which incorporated Section 11 expired on April 30, 1973 and the succeeding agree-

1. Respondents in this action are Locals 542, 542–A and 542–B. Since to this point, the parties have referred to them in the singular as "Local 542," the "Local" or the "Union" and the disposition of the case affects all of them identically, we shall do the same.

2. The terms "dual company" and "double-breasted operation," for purposes of this case, refer to a construction enterprise which consists of two companies (*e.g.*, a parent and its subsidiary), only one of which has a collective bargaining agreement with Local 542 or another AFL–CIO affiliate. The purposes and effects of these arrangements are more completely developed in the text.

3. In 1972, York and Local 542 seemingly settled their differences, and for a while York did employ members of the union. However, the parties soon disagreed on the terms of the settlement, and the strike resumed.

ments did not contain that language. The union had indicated its willingness to re-negotiate the controversial section so that it would be in compliance with Section 8(e). With the "allegedly objectionable" language no longer present, the union submits that the necessity for enforcing the order no longer exists and the case is moot.

■ It is firmly established that an N.L.R.B. order does not become moot by the mere compliance of the offending party. There remains a continuing obligation upon the party, and the Board is entitled to prevent the resumption of an unfair practice by the use of an enforcement decree. An order, lawful when made, does not become moot solely because changing circumstances may lessen its need. *C–B Buick v. N. L. R. B.*, 506 F.2d 1086, 1092 (3d Cir. 1974). The possibilities of repetition of the offending conduct in the context of a continuing relationship between the parties is a relevant consideration. *N.L.R.B. v. Raytheon Co.*, 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970); *N.L.R.B. v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 70 S.Ct. 833, 94 L.Ed. 1067 (1950); *C–B Buick v. N.L.R.B., supra.*

■ The exclusion of Section 11 from the master contract now in effect does not make the issue moot. Despite the union's concession, no agreement on the precise wording has been reached with York and, absent a judicial determination that the clauses under review are proscribed, the negotiators would remain uncertain.

Moreover, the Board's decision was not limited to the legality of the contested contract language but necessarily included the refusal to bargain. An order directed toward that phase of an existing dispute cannot be considered moot.

Section 8(b)(4)(ii)(A) [4] of the National Labor Relations Act provides that it is an unfair labor practice for a union to threaten or coerce an employer where an object is to force him into an agreement prohibited by subsection (e). Proscribed agreements generally are those which prohibit the employer from using or handling the products of another employer or require the employer to cease doing business with any other person—so-called "hot cargo" clauses.[5] The prohibition, however, does not extend to an agreement between a labor organization and an employer in the construction industry relating to contracting of work "to be done at the site of the construction . . . ."

In the Board's view, Section 11 ran afoul of the statutory prohibition because it constituted an agreement by York to cease doing business with a non-signatory company in situations not involving loss of work by Local 542 members. Thus, if York had been awarded a contract and wished to employ Local 542 members, they would not have been permitted to use equipment rented from a company which did not have a bargaining agreement with Local 542. The Board concluded that the construction industry exception in Section 8(e) did not apply because the boycotted supplier of un-

---

4. 29 U.S.C. § 158 reads in pertinent part:
   "(b) It shall be an unfair labor practice for a labor organization or its agents—
   (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   (A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by subsection (e) of this section;
   \* \* \* \* \* \*
   "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or oth-

erwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . ."

5. For a review of the clause and its ramifications, *see* Note, *Hot Cargo Agreements Under the National Labor Relations Act: An Analysis of Section 8(e)*, 38 N.Y.U.L.Rev. 97 (1963).

manned equipment did not have employees on the jobsite and the offending section of the agreement "reach[es] beyond the performance of work at the jobsite."

The union's position is that Section 8(e) was intended to apply only to products which would be incorporated into the structure itself rather than to tools which were used in the building operation. Further, the union argues that the exempting proviso applies here because the equipment was to be used on the jobsite.

The issue is whether Section 11 is aimed at the labor relations of York vis-a-vis its own employees or whether it is "tactically calculated to satisfy union objectives elsewhere," *National Woodwork Manufacturing Association v. N. L. R. B.*, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357, 378 (1967), that is, whether the activity of the union was primary or secondary. *See A. Duie Pyle, Inc. v. N. L. R. B.*, 383 F.2d 772 (3d Cir. 1967); *Retail Clerks International Association, Local 1288 v. N. L. R. B.*, 129 U.S.App.D.C. 92, 390 F.2d 858 (1968).

In general, secondary activities for organizational purposes are prohibited. In recognition of the special problems of the construction industry, however, Congress enacted the proviso to Section 8(e). It is not a broad exemption as the Court explained in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 630, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418, 428 (1974), but is limited to a single situation, allowing restrictive subcontracting agreements "only in relation to work done on a jobsite."

In *Essex County & Vicinity District Council of Carpenters v. N. L. R. B.*, 332 F.2d 636, 640 (3d Cir. 1964), we said the special treatment was

". . . apparently in recognition of problems peculiar to the construction industry, particularly those resulting from sporadic work stoppages occasioned by

the traditional refusal of craft unionists to work alongside non-union men on the same project. The exemption does not extend to other agreements such as those relating to subcontracts for supplies and materials to be transported to and delivered on the construction site."

The latter statement was later qualified in *National Woodwork Manufacturers Assn. v. N. L. R. B., supra*, where the Supreme Court approved a ban on the use of pre-cut doors in a building because the restriction protected the jobs of union members on that particular project. The Court characterized the boycott there as a shield for job protection and not as a sword for organizational activity. 386 U.S. at 630, 87 S.Ct. at 1245, 18 L.Ed.2d at 349.

The policy behind Section 8(e) and the construction industry proviso does not support the union's position. Its insistence on York's boycott of a non-signatory's equipment does not serve to protect the jobs of its members who may be called upon to work on any specific project which has been awarded to York.[6] Whether York owned or leased the equipment would have no effect on the number of men employed on a particular project.

The union's restrictive view of the subject matter of the hot cargo clause (*i. e.*, not to extend to equipment) and its expansive view of the exemption proviso are inconsistent with the developing body of case law. In *Acco Construction Equipment, Inc. v. N. L. R. B.*, 511 F.2d 848 (9th Cir. 1975), on-site repair of heavy construction equipment was held to be outside the exemption and, consequently, attempts to organize the mechanics were prohibited secondary activities. In two cases, courts decided that the delivery of ready-mixed concrete to the jobsite, even when additional work on the product is required at the scene, was not covered by the construction industry exemption. *Drivers, Salesmen, Local Union No. 695 v. N. L.*

---

**6.** *See* Lesnick, *Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e)*, 113 U.Pa.L.Rev. 1000, 1025 (1965), in which the author states, "The second limitation the Board has imposed insists that protective efforts involve bargaining unit employees only, as distinguished from 'members of the union in general.'" *See also Milk Drivers Union v. N. L. R. B.*, 335 F.2d 326 (7th Cir. 1964).

*R. B.,* 124 U.S.App.D.C. 93, 361 F.2d 547 (1966); *N. L. R. B. v. International Brotherhood of Teamsters, Local 294,* 342 F.2d 18 (2d Cir. 1965).

■ At best, the union's argument makes out only a doubtful interpretation of the Act, but in such situations the Board's interpretation and application are entitled to weight. *N. L. R. B. v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284, 1297 (1951). We fail to see how the rationale of eliminating friction between union and non-union workers on a jobsite could have any application to the use of inanimate equipment. *Essex County & Vicinity District Council of Carpenters v. N. L. R. B., supra.*

■ The Board's conclusion that Section 11 violated Section 8(e) was not erroneous.

■ Local 542 also contests the finding of coercion. It insists that, when York did not sever its ties with Wagman, the union no longer had any desire to enter into a collective bargaining arrangement. However, based on substantial evidence in the record, the Board found to the contrary. It felt that the Local's course of conduct, both before and after the strike, including the meetings with York established an intention to enter into a contract with the company, albeit on unacceptable terms. It is significant also that the union has never issued any formal and unequivocal disclaimer of a desire to represent York employees. Consequently, the Board had substantial support in the record for its finding that the union was attempting to coerce York into signing an illegal agreement in violation of § 8(b)(4).

The Board found that Local 542 was attempting to enlarge the bargaining unit by replacing the union which represented the Wagman employees. Having determined that the Operating Engineers Local had not disavowed representation of York employees, the Board ordered the union to bargain in good faith as required by Section 8(b)(3) [7] of the Act. Local 542's desire to become the representative of Wagman employees was not a required subject of bargaining and, therefore, the Local was told to "refrain from holding the negotiations hostage to a demand for a non-mandatory subject."

■ While parties are free to include voluntary subjects in their collective bargaining, those matters may not be made prerequisites to agreements on mandatory items. *N. L. R. B. v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *Industrial Union of Marine and Shipbuilding Workers v. N. L. R. B.,* 320 F.2d 615, 618 (3d Cir. 1963). The record here supports the Board's position that Local 542 wished to take over representation of Wagman employees from the United Steelworkers. The Operating Engineers were attempting, not to preserve their existing representation arrangement but, rather, to expand the bargaining unit. Since an objective of this nature is not a mandatory bargaining matter, the union's insistence upon it constituted a failure to bargain in good faith. *N. L. R. B. v. Local 19, International Brotherhood of Longshoremen,* 286 F.2d 661 (7th Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *N. L. R. B. v. International Brotherhood of Electrical Workers [Texlite Co.],* 119 N.L.R.B. 1792 (1958), *enforced,* 266 F.2d 349 (5th Cir. 1959). *See also Smith Steel Workers v. A. O. Smith Corp.,* 420 F.2d 1 (7th Cir. 1969). The Board's conclusion is both correct and fully consistent with the spirit of the Act. As the Supreme Court said in *Connell Construction Co. v. Plumbers & Steamfitters:*

"One of the major aims of the 1959 Act was to limit 'top-down' organizing cam-

---

7. 29 U.S.C. § 158(b)(3) reads in part:

"[T]o refuse to bargain collectively with an employer, provided it is the representative of his employees . . .

\* \* \* \* \* \*

(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ."

paigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees. Congress accomplished this goal by enacting § 8(b)(7), which restricts primary recognitional picketing, and by further tightening § 8(b)(4)(B), which prohibits the use of most secondary tactics in organizational campaigns. Construction unions are fully covered by these sections. The only special consideration given them in organizational campaigns is § 8(f), which allows 'prehire' agreements in the construction industry, but only under careful safeguards preserving workers' rights to decline union representation. The legislative history accompanying § 8(f) also suggests that Congress may not have intended that strikes or picketing could be used to extract prehire agreements from unwilling employers." (footnotes omitted) 421 U.S. at 632, 95 S.Ct. at 1840, 44 L.Ed.2d at 431.

The union responds that since York and Wagman were so closely interrelated, they were a single employer, and thus there was no violation of the duty to bargain. However, the Board did not find that York and Wagman constituted a single employer and, even if such a determination had been made, it could not have made bargaining on expansion of the unit a mandatory item. In the context of this case, the fact that only one employer might be involved does not alter the scope of the mandatory bargaining. *See N. L. R. B. v. I. B. E. W. [Texlite], supra.* The union's reliance, therefore, upon *Local 627, International Union of Operating Engineers v. N. L. R. B.*, 518 F.2d 1040 (D.C.Cir. 1975), is misplaced because that case turned on whether there was actually only a single employer.

Accordingly, we conclude that there was no error in the Board's decision that Local 542 failed in its duty to bargain with York.

The order will be enforced in all respects.

1. 29 U.S.C. §§ 158(b)(3), 158(b)(4)(ii)(A) (1970).

2. Complicating the legal significance of Local 542's demand for the right to represent those workers is the fact that District 50 of the Allied

ADAMS, Circuit Judge (dissenting).

The Court today enforces an order directed at violations of sections 8(b)(3) and 8(b)(4)(ii)(A) of the National Labor Relations Act.[1] Because the Board failed to make certain findings which in my view are necessary to the resolution of the controversy before us, I cannot agree that enforcement of the Board's order is appropriate at this time. I am therefore constrained to dissent.

Fundamental to the dispute in this matter is the identity of the "employer" with which Local 542 is to deal in its collective bargaining negotiations on behalf of its members. The Local maintains that York County Bridge (York) and G. A. & F. C. Wagman, Inc. (Wagman) are an integrated corporation, constituting one employer. It argues that the separation of the single employer into two parts is in effect a subterfuge designed to permit the company to obtain construction contracts both within Philadelphia (where subcontractors that are not signatories to agreements with AFL–CIO affiliated unions are prohibited from working on construction projects) and outside Philadelphia (where no such limitation exists). Under this set of hypothesized facts, bargaining would properly take place between Local 542 and the unitary York-Wagman Company.[2] York, of course, takes the opposite tack. It submits that it and Wagman are distinct entities, and that any pressure brought by Local 542 against York in order to affect Wagman must therefore be secondary in nature. In the context of its understanding of the facts, York urges that Local 542 may not insist upon the right to bargain with Wagman and may not impose a "hot cargo" clause upon York.

Resting its decision on a narrow ground, the Board did not make a specific finding with regard to the identity of the employer. Over the dissenting voice of Acting Chairman Fanning, it held that the Local's de-

Technical and Construction Workers currently represents the construction engineers employed by the Wagman side of the enterprise. *See* note 7 *infra.*

mands transgressed the dictates of section 8(b) of the Act. The Board could reach that result only by concluding that resolution of the single/dual employer issue is not essential to a determination of the unfair labor practice charges. By enforcing the Board's order, the majority of the Court necessarily agrees with that stance.

My reading of the law is different, however. In my opinion, a ruling on the unfair labor practice charges cannot properly be made, in the circumstances of this case, without a prior finding on the single/dual employer question. Enforcement of the Board's order would thus appear inappropriate.

## A. *The Section 8(b)(3) Charges*

Section 8(b)(3) of the Act makes a union's refusal to bargain collectively with an employer an unfair labor practice. The duty to bargain collectively, as defined in section 8(d), includes "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and [to] confer in good

faith with respect to wages, hours, and other terms and conditions of employment . . . ."[3] Although a union may bring economic pressure to bear upon an employer during the negotiations,[4] it may not condition bargaining upon discussion of matters about which bargaining is not made mandatory by the terms of section 8(d).[5] That is, a union commits an unfair labor practice if it refuses to discuss subjects respecting "wages, hours, and other terms and conditions of employment" unless the employer agrees at the same time to discuss items that do not concern those matters.[6]

The charge in this case is that Local 542 refused to come to the bargaining table so long as two specified non-mandatory terms were excluded from discussion. The first non-mandatory item, a hot cargo clause, is discussed in part B of this opinion. Local 542 is also charged with demanding negotiations over a term expanding the bargaining unit to include employees on the Wagman side of the enterprise.[7] Insistence on an inappropriate bargaining unit has been held violative of section 8(b)(3),[8] and the

3. 29 U.S.C. § 158(d) (1970).

4. *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

5. *NLRB v. Wooster Div. of Borg-Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823, 828 (1958).

6. The Act is symmetrical in this regard, placing the same burden upon the employer through § 8(a)(5), 29 U.S.C. § 158(a)(5) (1970).

7. Section 9 of the Act, 29 U.S.C. § 159 (1970), sets out the procedures that govern the selection of the appropriate bargaining unit. The choice of the unit can be critical to a union's success in organizing an employer's workers, since a union may represent only employees who are within a bargaining unit in which a majority of the unit voted for the union in a Board-sanctioned election. Sections 9(a), 9(c)(1) of the Act, 29 U.S.C. §§ 159(a), 159(c)(1) (1970). The identification of the bargaining unit has frequently been "the decisive factor in [B]oard elections, determining whether there would be any collective bargaining at all in a plant or enterprise. Unions and employers have sought to gerrymander accordingly." B. Meltzer, *Labor Law* 290 (1970).

Local 542 was selected in an election taken among the members of the York bargaining

unit. Wagman has employees who perform the same tasks as the members of Local 542, and who would possibly be included in the same bargaining unit as Local 542's members if York and Wagman constitute one employer.

The Wagman employees are currently represented by District 50, however. If the bargaining unit is to encompass both York and Wagman employees, Local 542 could perhaps endeavor to obtain a ruling by the Board that York and Wagman are one employer, in the context of seeking a new representation election among all York-Wagman employees who perform similar work. The election bar of § 9(c)(3) or the contract bar announced in *Deluxe Metal Furniture Co.,* 121 N.L.R.B. 995 (1958), could stand in the way of such an approach. *See NLRB v. Burns Int'l Security Services, Inc.,* 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 1578, 32 L.Ed.2d 61 (1972); *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

8. *Sperry Systems Mgt. Div. v. NLRB,* 492 F.2d 63, 67–68 (2d Cir)., *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *Smith Steelworkers v. A. O. Smith Corp.,* 420 F.2d 1, 8 (7th Cir. 1969); *Douds v. International Longshoremen's Ass'n,* 241 F.2d 278, 281–83 (2d Cir. 1957).

unit would be improper if York and Wagman are separate employers.[9]

But if York and Wagman are in effect a single employer, the expansion of the bargaining unit to include Wagman employees could well be a matter concerning the "terms and conditions of employment" of the members of Local 542. As such, it would be a mandatory subject of bargaining, and a demand by Local 542 that it be discussed would not be a section 8(b)(3) violation.[10]

The outcome of the section 8(b)(3) charge brought against Local 542 thus appears to hinge upon a prior determination of the relationship between York and Wagman. If they are separate employers, the finding of an unfair labor practice on the part of Local 542 is most probably justified; if they are a single employer, the Local has probably not violated section 8(b)(3). Absent the antecedent finding, I would not enforce the Board's order relating to the section 8(b)(3) violation.

### B. The Section 8(b)(4)(ii)(A) Charges

Similarly, I believe that a proper resolution of the section 8(b)(4)(ii)(A) charge depends upon the same finding regarding the relationship between York and Wagman.

Section 8(b)(4)(ii)(A) provides that a labor union commits an unfair labor practice when it threatens, coerces, or restrains an employer with the objective of forcing that employer to enter an agreement containing a hot cargo clause prohibited by section 8(e)

of the Act. The majority's review of the record indicates that there is a basis for the Board to have found that Local 542 sought to include such a hot cargo clause in its collective bargaining contract with York. I agree that there is such a basis. But that in itself is not enough to establish a violation of section 8(b)(4)(ii)(A), for the element of restraint or coercion by the union must also be established.

Local 542 refused to furnish York with employees until an acceptable contract had been negotiated. Such refusal constitutes restraint or coercion within the meaning of section 8(b)(4)(ii)(A) only if the employer is dependent upon the union's referral of employees.[11] But whether York was dependent upon Local 542 members turns on whether York is an independent enterprise, unable to bid successfully in its geographical area of operation without a contract with the Local, or is merely a segment of the unitary York-Wagman entity, relying on the Local for only part of its operation. A finding by the Board on the single/dual employer question would thus appear to be a prerequisite to a ruling on whether Local 542 violated the terms of section 8(b)(4)(ii)(A) of the Act, just as it is critical to the 8(b)(3) charges.

### C. Disposition of the Petition

The analyses set forth in parts A and B of this opinion suggest the propriety of a denial of enforcement of the Board's order and a remand to the Board for a determina-

---

**9.** The collective bargaining obligation, whose structure is built upon the bargaining unit established in accord with § 9 of the Act, exists only between an employer and the representative of its employees. *Allied Chemical & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166–70, 92 S.Ct. 383, 390, 30 L.Ed.2d 341, 350 (1971).

**10.** Local 542 alleges that Wagman uses its subsidiary, York, to employ and lay off Local 542 members as bidding conditions require, giving it a useful device to avoid employing such personnel except where essential, and depriving the union of substantial work opportunities. This practice would certainly be viewed as having a telling impact upon the union's members. *Cf. Allied Chemical & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157,

178–79, 92 S.Ct. 383, 397, 30 L.Ed.2d 341, 357 (1971).

Significantly, the subcontracting of work to non-union contractors, which has a similar effect upon the work opportunities of the union members, has been held to be a mandatory subject of bargaining. *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233, 241 (1964).

**11.** *Plumbing & Pipefitting Local 5 v. NLRB,* 321 F.2d 366, 370–71 (D.C.Cir.), *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963); *Columbus Bldg. & Trades Council,* 149 N.L.R.B. 1224, 1225–27 (1964). *Cf. NLRB v. Operating Engineers Local 825,* 315 F.2d 695, 699 (3d Cir. 1963).

tion whether York and Wagman are one employer or two. In the unusual context of this case, however, I believe that a remand is unnecessary, and that denial of enforcement alone is the course that the Court should take.

Under the compulsion of the rule of C–B Buick,[12] the majority holds that the case is not, as a technical matter, moot. With that conclusion I cannot differ. But the status of the current relations between Local 542 and York, as I perceive them, leads me to believe that the case no longer represents a viable dispute, and that a remand and possible enforcement of a Board order in futuro are unnecessary. Counsel for Local 542 indicated in open court that his client no longer has an interest in negotiating a collective bargaining contract with York, and that a hot cargo clause will not be sought in any event. Such a position substantially reduces the Board's interest in ensuring that the parties will observe those rules of fair play established by Congress in section 8 of the Act.[13] When it is apparent that no further bargaining will be undertaken, the Board's interest would appear to be attenuated, making judicial enforcement of its order unnecessary.

This Court has long held that the judicial response to a Board order may be fashioned, in an exercise of the Court's equitable power, so as to further the objectives of the Act.[14] Given the posture of the relations between the union and the employer, a continuation of proceedings in this matter would not further the objectives of the Act, and the Court's equitable power should therefore not be invoked. This is particularly so in light of the limited development in the record concerning the single/dual employer issue, a newly evolving area of labor law. For that reason, it seems that it would be most fitting to close the case here, and to deny enforcement without a remand for further proceedings.

---

12. C–B Buick, Inc. v. NLRB, 506 F.2d 1086, 1092 (3d Cir. 1974).

13. Cf. H. K. Porter Co. v. NLRB, 397 U.S. 99, 102–04, 90 S.Ct. 821, 823, 25 L.Ed.2d 146, 150 (1970).

14. C–Buick, Inc. v. NLRB, 506 F.2d 1086, 1092 (3d Cir. 1974); NLRB v. Kingston Cake Co.,

206 F.2d 604, 611 (3d Cir. 1953); NLRB v. Globe Auto Sprinkler Co., 199 F.2d 64, 70 (3d Cir. 1952); NLRB v. National Biscuit Co., 185 F.2d 123, 124 (3d Cir. 1950) (per curiam). Cf. NLRB v. Cheney California Lumber Co., 327 U.S. 385, 389–91, 66 S.Ct. 553, 555, 90 L.Ed. 739, 741 (1946) (Stone, C. J., concurring).