RETAIL CLERKS LOCAL 588, RETAIL CLERKS INTERNATIONAL ASSOCI-ATION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–1722.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1977.

Decided Nov. 4, 1977.

As Amended Nov. 4, 1977.

David J. Salniker, Berkeley, Cal., with whom Robert P. Cowell, San Francisco, Cal., was on the brief, for petitioner.

John S. Irving, Gen. Counsel, Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief for N. L. R. B.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by McGOW-AN, Circuit Judge.

McGOWAN, Circuit Judge:

This petition by a union to review an order of the National Labor Relations Board presents the question of whether the union's invocation, unaccompanied by striking, picketing, or the threat of either, of the grievance-arbitration machinery of the collective bargaining agreement to resolve a concededly colorable contract interpretation issue is an unfair labor practice within the meaning of sections 8(b)(1)(A), 8(b)(2), and 8(b)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(1)(A), 158(b)(2), and 158(b)(3) (1970). For the reasons herein-

after appearing, we hold that it was not, and accordingly set aside the Board's order.

I

### A. The Facts.

The circumstances giving rise to the Board proceeding are not in dispute. The complainant employer, Raley's Inc., a California corporation, began operation in 1936 with the opening of a food store in northeastern California. By the time this controversy arose, Raley's had grown to include 21 food stores in northern California and western Nevada, the employees of which have always been represented by petitioner, Retail Clerks Local 588. Since 1958, Raley's also has operated "drug," or "family," centers at adjoining but physically separated facilities at 11 of its locations. Between that year and 1963, it recognized the Independent Drug Clerk's Association (the Association) as the representative of its drug store employees at these separate facilities, and the two signed a collective bargaining agreement.

With the opening in 1963 of Raley's sixth and seventh drug centers, Local 588 demanded recognition as the representative of the drug store clerks. Given the rival union situation, the Board conducted an election on May 22, 1964 which the Association won, causing the Board to certify it as the proper collective bargaining representative. As Raley's opened additional drug centers, their employees likewise were represented by the Association, although the employees in the adjoining food stores continued to be represented by Local 588.

Thus matters stood until June 1971 when Local 588 and Raley's signed a new three-year collective bargaining agreement that, among other provisions, included the following clause covering "NON–FOODS DEPARTMENTS:"

It is agreed that in the event the Employer, after the execution of this Agreement, institutes a non-food department, either directly or by concession, in any retail food store or stores within the geographical jurisdiction of this Agreement then a

non-food clerk classification and rates of pay therefor may be established.[1]

In early 1974, near the end of this contract's effective period, Raley's remodeled its "El Dorado Hills" drug store-food store location. This was the first of five such efforts by Raley's at the same number of its drug store-food store locations to increase its food patrons' utilization of its drug stores, the profitability of which was not satisfactory. In addition to removing the partitions between the two stores, Raley's took out the drug store's cash registers (except those located at special camera, cosmetic and pharmacy counters) and redesigned the entrances and exits so that the flow of people in and out of the store would be routed through the checkout area that previously had served only the food store. Some expansion of the area devoted to food products and some contraction of the area and number of employees devoted to non-foods, i. e., "drug" or "family" products, accompanied the remodeling, as did an effort to minimize duplication caused by the display of the same products in both areas.

Soon after these changes were made, Local 588 informally requested that the El Dorado Hills store manager comply with the "NON–FOODS DEPARTMENTS" clause of the June 1971 collective bargaining agreement by applying its wage and benefits provisions to the employees of the now conjoined drug store. Local 588 argued then, as it continues to argue in this court, that the remodeling efforts in effect created a sundries department within the affected food store. Its informal inquiry failing, the President of Local 588, on March 12, 1974, wrote to the Executive Vice President of Raley's formally requesting that the issue be submitted to a "Board of Adjustment" as provided for by the collective bargaining agreement's grievance mechanism.

While the dispute over the implications of the El Dorado Hills remodeling made its way through the contractual grievance procedure without final resolution, Local 588 and Raley's signed another three-year labor contract in June 1974 that retained the same "NON–FOODS DEPARTMENTS" provision.[2] The collective spirit reflected in the signing of the new agreement apparently continued through mid-September, during which period Raley's and Local 588 agreed to arbitrate the El Dorado Hills dispute and selected a mutually satisfactory arbitrator. The arbitration commenced on October 24, 1974.

Nonetheless, by September 24, 1974, Raley's apparently had decided that the contractual grievance procedure did not provide the appropriate means for handling the dispute. On that date it filed unfair labor practice charges against Local 588 founded upon the latter's attempt to arbitrate its claim that the change in the El Dorado Hills lay-out activated the "NON–FOODS DEPARTMENTS" clause. In the face of Raley's placement of the dispute before the Board, Local 588 agreed to suspend the arbitration. Over the next nine months Raley's filed a succession of amended charges against Local 588. These charges eventually culminated on June 25, 1975, in the issuance by the Board's Acting Regional Director of a complaint alleging Local 588's commission of three unfair labor practices[3]

---

1. 1971–1974 Master Food & Liquor Agreement, Retail Clerks Union, Local 588, § (c), *reprinted in* Appendix to the Briefs (App.) at 249. The precise reason for including this provision in the contract at this time is not indicated in the record. At oral argument, however, counsel for Local 588 did refer to Local 588's desire to make the contract responsive to the possibility that Raley's food stores, in keeping with a nationwide trend, would be expanded to include a large sundries department. It may not be unimportant in this regard that Raley's newest drug store at the time the 1971 agreement was signed was less permanently separated from the immediately contiguous food store than the drug stores at the other locations.

2. 1974–1977 Master Food & Liquor Agreement, Retail Clerks Union, Local 588, *reprinted in* App. at 247. There is no hint in the record that the El Dorado Hills dispute was an issue in or had any impact on the negotiation process leading up to the new agreement.

3. The unfair labor practices charge fell under the following portions of NLRA § 8(b), 29 U.S.C. § 158(b) (1970):

in the course of its response to the remodeling at all five of the locations.[4]

### B. *The Recommended Decision of the Administrative Law Judge.*

Two months after the complaint was filed, an Administrative Law Judge (ALJ) conducted a hearing in the case. In addition to the facts related above, it became clear at the hearing that, while Raley's had increased the physical connection between and proximity of employees in its drug and food stores and, to a degree, had rearranged the tasks of those employees, it had retained considerable physical, managerial, and job-related separation between the two sets of employees.

On the basis of these undisputed facts, the ALJ recommended that the complaint be dismissed. App. at 18–37, *reported in* 224 N.L.R.B. 1642 (1976). Initially, he addressed Local 588's contention that the Board's own *Collyer* doctrine, *see* Collyer Insulated Wire, 192 N.L.R.B. 837 (1971), required that the Board defer a decision on the complaint pending action under the parties' grievance-arbitration machinery. *Collyer* mandates such deference, he noted, only in cases involving purely contractual disputes. In this case, however, the ALJ was of the view that a unit dispute permeated Local 588's contractual claim.

The ALJ appeared to believe that the union's claim that the "NON–FOODS DEPARTMENTS" clause covered the drug employees could only be honored if two questions were answered affirmatively: first, did its contract with Raley's cover the employees of the formerly separate drug stores; and second, could those employees be denied their duly elected and certified representative, the Association, in favor of Local 588? The latter question depended, so it was said, on the proper application of the Board's "accretion" doctrine under which the Board combines two units into one upon a strong showing not only that a single bargaining representative *could* represent the interests of employees currently ranged in two units, but also that separate units *cannot* satisfactorily represent those interests.[5] Although the first step in this analysis does raise a contractual question as to which deference to arbitration normally would be appropriate, the second step, so reasoned the ALJ, lies within an area of Board supremacy. Hence, *Collyer's* policy of deference did not apply. App. at 30–31, *citing Combustion Engineering, Inc.,* 195 N.L.R.B. 909 (1972).

The ALJ did not proceed immediately to resolve the accretion issue that he had so identified. Instead, he addressed himself to the validity under the National Labor Relations Act of the legal theory of the com-

---

8(b) It shall be an unfair labor practice for a labor organization or its agents—
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title   .   .   . ;
(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this tile.
*See* note 6 *infra.*

**4.** After Raley's completed similar changes at each of four other locations, Local 588 repeated its contractual claims and asked that the con-

tractual grievance procedure be used. Hence, by the time the Board issued its complaint in mid-1975, it could link its allegations to the aftermath of all five remodelings. Only the El Dorado Hills dispute, however, had reached the point of actual arbitration.

**5.** The heavy burden of proof imposed follows from the Board's reluctance both to overturn the employees' earlier choice as to their bargaining representative and to upset a long-standing process of negotiation between that representative and the employer.

For like reasons, the Board will not even lighten the burden when the union and the employer *agree* to expand the union's unit by adding employees represented by another union. *See Melbet Jewelry Co.,* 180 N.L.R.B. 107 (1969). The one exception to this rule, of course, occurs when the affected employees, by majority vote, elect to change representatives. *See* note 16 *infra.*

plaint. That theory contends that because the Board previously had separated the employees in question into two units, Local 588's attempt to resolve a unit dispute through the contractual grievance-arbitration mechanism in essence made the accretion issue into a fulcrum. Depending on the resolution of the accretion issue, that is, the NLRA lever would tip either in favor of Local 588, in which case the drug employees would be included within its bargaining unit, or against Local 588, in which case its having raised the issue as it did would constitute three unfair labor practices.[6]

The General Counsel's office argued before the ALJ, as it has continued to contend in this court, that the complaint's fulcrum theory follows inexorably from *Smith Steel Workers*, 174 N.L.R.B. 235, *aff'd in relevant part, sub nom. Smith Steel Workers v. A. O. Smith Corp.*, 420 F.2d 1 (7th Cir. 1969), and related cases. *Smith* involved a situation similar to that in this case, except that in *Smith* the union in Local 588's shoes pressed its arbitration demand not only *before* but also *immediately after* the Board, in a unit-clarification proceeding, *see* NLRA § 9(c)(1), 29 U.S.C. § 159(c)(1) (1970), discussed *infra*, had determined that it was not the appropriate representative of employees long represented by another union. The Board found that this conduct violated the union's section 8(b)(3) duty to bargain collectively with the employer over "a unit appropriate for [8(b)(3)'s] purposes."[7]

In affirming this part of the Board's decision in *Smith Steel Workers*, the Seventh Circuit's broad dicta unquestionably broaches the fulcrum theory of the complaint in this case:

> [O]nce the Board has determined that the union is not the correct representative of those employees, it is under a duty to refrain from demanding continued recognition as their representative. Where the Board's determination is correct, subsequent insistence upon recognition by the union violates § 8(b)(3) and constitutes an unfair labor practice.[8]

Nonetheless, the ALJ held that *Smith Steel Workers* and like cases turned on the proximity of, and the lack of changed circumstances between, the Board's previous multiple-unit determination and the union's reassertion of its single-unit claim. In a case in which no clear disrespect for a recent and controlling Board determination nor any strike or picketing occurred, the strong policy in favor of private and consensual resolution of labor disputes should be honored.[9] Thus, the ALJ ruled that arbitration could legally proceed, leaving "the 'Board's superior authority' [to] be imposed when, if ever, an arbitrator resolves the dispute in a manner repugnant to the policies of the Act, and the Union attempts to implement the award."

Having rejected the complaint's fulcrum theory, the ALJ had no need to decide the accretion issue. Nonetheless, he did so

---

**6.** If the fulcrum tipped against Local 588, it would be found (a) to have refused to bargain collectively over an appropriate unit under § 8(b)(3), and (b) in attempting to apply its contract with a union-security clause to the drug employees, to have coerced and restrained those employees' exercise of free representational choice under § 8(b)(1)(A), and (c) to have attempted to enlist Raley's aid in discriminating against those employees because they do not belong to Local 588 under § 8(b)(2). *See* note 3 *supra;* note 7 *infra.*

**7.** NLRA § 9(a), 29 U.S.C. § 159(a) (1970) (defining terms in § 8(a)(3)). The *Smith Steel Workers* doctrine has been extended in subsequent cases to encompass § 8(b)(1)(A) and 8(b)(2) unfair labor practices insofar as the contract, that a union asserts covers workers previously represented by others, contains a union-securi-

ty clause. *E.g., Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352, 1354–55 (9th Cir. 1970). The theory is that the union's attempt to force the employer to bargain over an inappropriate unit also embodies an attempt to coerce the employees who are outside of the appropriate unit and to engage the employer's aid in that endeavor.

**8.** *Id.* at 8. Similar dicta may be found in *Sperry Systems Management Div., Sperry Rand Corp. v. NLRB*, 492 F.2d 63, 68 (2d Cir.), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974), and throughout *Boire v. International Bhd. of Teamsters*, 479 F.2d 778 (5th Cir. 1973).

**9.** *E. g., Carey v. Westinghouse*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *see Local 174, Teamsters Union v. Lucas Flour*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

against the contingency that the Board might disapprove his treatment of the *Smith Steel Workers* question. He determined that the changed layouts did not so unify the interests of the drug and food employees that they could not continue to receive adequate representation in separate units.

## C. *The Board's Decision.*

True to the ALJ's fears, the Board overturned his narrow interpretation of the *Smith Steel Workers* doctrine:

> Contrary to the view of the Administrative Law Judge, here, as in [*Smith Steel Workers* and subsequent cases], the Union's insistence on application of the terms of its contract to the drug center employees amounted to *adamant insistence* that Raley's bargain for a unit which the Board previously found inappropriate. It is irrelevant that the Board's unit finding had been made prior to a change in circumstances. . . .
> [I]f, upon subsequent litigation before this Board, its position that the drug center employees have accreted to the unit which it represents were found to be correct, then no violation would be found; but if it be found that the drug center unit maintained its identity and continued to be separately appropriate, the Respondent contravenes the mandate of Section 8(b)(3) of the Act. *Retail Clerk's Local 588, Retail Clerks Int'l Association,*

224 N.L.R.B. 1638, 1640 (1976) (footnote omitted) (emphasis added).

Accepting the ALJ's determination of facts as well as of the accretion issue, the Board found that the lever tipped against Local 588, which was thereby guilty of a section 8(b)(3) unfair labor practice.[10] Consequently, the Board issued a broad order requiring Local 588 to cease and desist from claiming in any way or in any private forum that its contract covered Raley's drug employees at any of the eleven locations, and from coercing employees in the exercise of rights guaranteed in section 7.[11]

## II

Essentially, we adopt the analysis of the ALJ that seeking arbitration of this issue, in the precise circumstances revealed by the record, did not entail the "adamant insistence" on an inappropriate unit that constitutes an unfair labor practice.

Local 588 correctly felt, and the Board's decision implicitly acknowledges, that the layout changes in the five stores between 1974 and 1975 created a sufficiently different unit determination situation from that faced by the Board in its 1964 certification proceeding so that Local 588 could colorably claim that the drug store employees had become part of its unit.[12] In the past, moreover, the Board has recognized that a union in Local 588's position has the right,

---

**10.** That finding made, it took the Board only one additional sentence to find § 8(b)(1)(A) and 8(b)(2) unfair labor practices as well, in light of the union-security clause in Local 588's collective bargaining agreement with Raley's. *See* notes 6 & 7 *supra.*

**11.** Local 588 has challenged the breadth of this order because of its coverage of the six Raley's drug-food locations that were not involved in the proceeding, and because it opens Local 588 to a contempt action should it subsequently be found to have coerced employees at any of Raley's 21 food and food-drug locations, even if the coercion is wholly unrelated to that litigated in this action. In light of our refusal to grant enforcement of the Board's order, we do not reach this issue.

**12.** This is not to say that we find Local 588's claim of accretion so convincing that we would overturn the Board's (and thus the ALJ's) nega-

tive determination of it. Accretion is a limited doctrine, *see* note 5 *supra,* dependent upon the facts of each case, *NLRB v. Food Employer's Council,* 399 F.2d 501, 505 (9th Cir. 1968), and well within the Board's area of particular competence. In light of the ALJ's finding, there can be no doubt that the changed situation at the five Raley's stores gave the drug and food employees a strong enough community of interests to have allowed the Board, were it writing on a clean slate, to include them in a single bargaining unit. But the maintenance at the five stores of an undisputedly careful system of separate day-to-day employee supervision of the drug and food employees, the separate chains of administrative command, and the distinct merchandising duties, support the Board's finding that a sufficient duality of interests continued to exist to justify retention of two units.

under section 9(c)(1) of the NLRA, 29 U.S.C. § 159(c) (1970), to bring a "unit-clarification" action asking the Board in effect for a declaratory judgment of changed circumstances leading to accretion. *See, e. g., Smith Steel Workers v. A. O. Smith Corporation, supra,* 420 F.2d at 5–6.[13] Nonetheless, the Board here seeks to deny Local 588 the ability, in response to those changed circumstances, to invoke, without coercive pressures of any kind upon the employer, the mutually agreed upon mechanism for handling disputes arising under the contract.

The Board has two premises for this prohibition: (1) that it alone may finally decide unit disputes; and (2) that, even if an employer and a union agree to expand a union's unit to conclude otherwise-represented employees, that course is still unlawful absent a Board accretion (*i. e.,* unit) determination. These premises lead the Board to conclude that arbitration cannot *fully* settle the dispute, so that even requesting the employer to go through the process is so coercive as to be an unfair labor practice.

Both the Board's premises and its conclusion are faulty. First, the Board ignores the important role played by the contractual issue in dispute in this case. The 1971 and 1974 contracts between Raley's and Local 588 contain a "NON–FOODS DEPARTMENTS" clause that colorably appears, at least on its face, to have anticipated the remodeling events of 1974 and 1975.

*See* note 1 *supra.*[14] Moreover, the resolution of this contractual claim is not irrelevant to a resolution of the issues underlying this case, even if it is conceded that the Board has the sole final authority to resolve unit disputes.[15] Thus, the Board's analysis ignores the possibility that Local 588, by contracting with Raley's and by gaining the majority support of the drug employees, could add those employees to its unit *without* necessitating the Board's intervention.[16] Assuming that Raley's and Local 588 took the first step in this process by including the "NON–FOODS DEPARTMENTS" clause in their contract, Local 588 was well within its rights in invoking the grievance-arbitration procedure to keep Raley's from retreating.

Further, even if the accretion issue were not thus avoided, a contractual issue would remain. If, when the Board decided the unit question, it had held that the drug employees had become part of Local 588's unit, Raley's still would not have had to pay them the wage and other benefits provided for in the "NON–FOODS DEPARTMENTS" clause unless it agreed that the clause covered those employees. Hence, when Local 588 sought arbitration, an arbitrator's resolution of this purely contractual matter was potentially useful to the Board in fully deciding the overall dispute, even if the Board is allowed its assumption that any arbitrated resolution of the unit ques-

13. Although not free from doubt, given the breadth of the rule the Board has advanced in this case, quoted on p. 774 *supra,* the Board apparently would not consider a § 9(c)(1) action "adamant insistence" and thus would not apply its fulcrum theory to that method of asserting a union's claim that its contract covers employees represented by another organization.

14. Neither the ALJ nor the Board considered, much less rejected or found frivolous, Local 588's interpretation of the "NON–FOODS DEPARTMENTS" clause.

15. We, like the Supreme Court in *Carey v. Westinghouse,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), *discussed in* note 21 *infra* and accompanying text, do not accept this premise, however.

16. Language in *Douds v. International Longshoremen's Ass'n,* 241 F.2d 278 (2d Cir. 1957), which the Board cites in *favor* of its unfair labor practice finding, supports this analysis. The Second Circuit noted that although a determination by the Board "is conclusive . . . it may be altered by agreement of the parties, if the process involves no disruption of the bargaining process or obstruction on commerce and if the Board does not disturb the agreement in a subsequent representational proceeding. [This] process of change is contemplated by the Act and is obviously consistent with its policy of avoiding obstructions on the flow of commerce by encouraging collective bargaining." *Id.* at 282.

tion would trench on its area of supremacy.[17]

The Board might concede the above and yet still argue that because resolving the contractual question will not assuredly and completely resolve the overall dispute, to arbitrate that question instead of seeking a unit clarification under section 9(c)(1) entails two evils sufficient to make out an unfair labor practice under section 8(b)(3). First, arbitration would disrupt the bargaining relationship unduly by invoking a process that did not promise to resolve any crucial issues and that might result in duplication of dispute-resolving efforts; second, it would reflect negatively on the Board's ultimate authority over unit questions. In support of this interpretation of section 8(b)(3), the Board's decision and its brief in this court cited a series of cases, primarily *Smith Steel Workers, supra,* which found unions guilty of section 8(b)(3) violations in arguably analogous situations.

All of these cases, however, involved at least one, and often a larger number of, aggravating circumstances that are not present in the case before us. Thus, Local 588 did not disrupt its bargaining relationship with Raley's by striking or picketing (or even threatening to do so), or by pressing its demands during—and to the total frustration of—collective bargaining over a new contract, as occurred in *Douds v. International Longshoremen's Ass'n,* 241 F.2d 278 (2d Cir. 1957), or even by insisting upon arbitration after the employer refused to consent to that method of dispute resolution, as occurred in *Smith Steel Workers, supra.* Nor did Local 588 insist upon clearly duplicative and unnecessary measures that flouted the Board's recently exercised authority by renewing arbitration demands shortly after the Board decided the unit issue against it,[18] as in *id.; Douds, supra; Sperry Systems Management Div., Sperry*

*Rand Corp. v. NLRB,* 492 F.2d 63 (2d Cir.), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974), or by invoking judicial process to enforce an arbitration award that conflicted with, or was mooted by, the Board's subsequent negative resolution of the accretion question, as in *Sperry Systems, supra. Cf. Boire v. International Bhd. of Teamsters,* 479 F.2d 778 (5th Cir. 1973) (staying state court enforcement of arbitration pending completion of a simultaneously filed unit-clarification action); *Local 7–210, Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 475 F.2d 194 (7th Cir.), *cert. denied,* 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973) (denying enforcement of arbitration decision because of a subsequent—and contrary—Board decision).

Although dicta in these cases occasionally transcend these seriously aggravating circumstances and come close to condemning the milder and more orderly action taken by Local 588 in this case, *see* note 8 *supra* and accompanying text, we do not believe that section 8(b)(3) can bear such a broad reading. The wholly peaceful and contractually authorized means initiated by Local 588, as well as the intervening changes in circumstances and the ten-year period of time between the Board's previous unit determination and the local's renewed claim to represent the drug employees, belie the degree of disruption of the bargaining relationship and of disrespect for the Board's authority that a section 8(b)(3) violation requires.

This conclusion is clearly warranted by the Supreme Court's decision in *Carey v. Westinghouse,* 375 U.S. 261, 84 S.Ct. 401 (1964). In *Carey,* a union (IUE) sought arbitration of its claim that certain employees of Westinghouse, who long had been represented by another Board-certified union, were performing tasks covered by IUE's contract. Westinghouse refused to

---

17. *But see* note 15 *supra.* A different question might be raised in this regard if the union's accretion claim were wholly frivolous, thus making the arbitration less assuredly useful. We need not reach the issue, however, in light of Local 588's good faith assertion of a colorable accretion claim.

18. In fact, as soon as Raley's brought this dispute before the Board, and even though the Board's decision would not necessarily resolve all of the contractual issues involved, Local 588 immediately agreed to suspend arbitration.

arbitrate what it conceived to be a purely representational issue. IUE's petition for an order compelling arbitration was denied by a state court on the basis of the Board's allegedly exclusive jurisdiction over unit disputes.

In reversing the Board, the Supreme Court acknowledged that the dispute alternatively could be described as a contractual matter involving work assignments or a unit question concerning the proper representative of certain employees. *Id.* at 263, 84 S.Ct. 401. The Court further noted that the arbitration process, as in the present case, would not have included the rival union,[19] that it would not necessarily have resolved all of the issues implicated by the dispute, and that a more complete resolution of the issues might have followed a Board unit-clarification action under section 9(c)(1). *Id.* at 265, 267, 84 S.Ct. 401. Yet, none of these possible characterizations of the dispute, outcomes of arbitration, or alternative resolution procedures changed the Court's conviction that arbitration was appropriate.

The firmness of that conviction rested squarely on the "persuasive curative effect" that often accompanies arbitration, even "[i]f it is [used in] a representation matter." *Id.* at 272, 84 S.Ct. at 409. In such a matter, the Court suggested, the Board as well as the parties may benefit from arbitration, if only because an impartial authority will have previously undertaken to sort out the facts of the case, and to interpret the contract. No matter how the Board eventually decides the case, if, indeed, it subsequently is required to do so, much of its work is already done for it by the arbitrator.[20] Hence, the "conjectural" "hazard of duplicative proceedings" should arbitration proceed is far outweighed by the "inevitable" "undesirable consequences" of "altogether preclud[ing] any attempt at resolving disputes of this kind by arbitration." *Id.* at 273, 84 S.Ct. at 409 (Harlan, J., concurring).[21]

Finally the Court noted that its decision preserved the Board's authority, in that should it subsequently "disagree with the arbiter, . . . the Board's ruling would of course, take precedence." *Id.* at 272, 84 S.Ct. at 409 (opinion of the Court). It is this passage in *Carey* that may be said to have in contemplation the *Smith Steel Workers* doctrine discussed above. Only if a union's action in seeking arbitration, like those involved in *Smith Steel Workers* and allied cases, occurs under conditions suggesting that it rejects the notion that a subsequent Board decision does not take precedence is the policy favoring private, consensual dispute resolution overcome.

19. Actually, in this case, Local 588's rival union, the Association, never intervened before the Board, choosing instead to rely on the General Counsel and Raley's to represent its interests. Hence, this presumed value of a Board proceeding over arbitration seems less weighty in this case.

20. In many cases enough is done by the arbitrator that "the Board [shows] deference to the arbitral award, provided the procedure was a fair one and the results were not repugnant to the Act." 375 U.S. at 270–71, 84 S.Ct. at 408.
The Court also noted that, a "blurred line . . . often exists between [contractual] disputes and controversies over . . . the appropriate bargaining unit." *Id.* at 268, 84 S.Ct. at 407. *Compare, e. g., Urban N. Patman,* 197 N.L.R.B. 1222, *aff'd sub nom. Provision House Workers v. NLRB,* 493 F.2d 1249 (9th Cir. 1974), *with* the Board's decision in this case, *Retail Clerks Local 588, Retail Clerks International Association,* 224 N.L.R.B. 1638 (1976). If the price of mistaking a unit dispute for an arbitrable contractual one is the commission of an unfair labor practice, unions and employers will be loath to take a chance on arbitration. That result clearly would thwart the strong policy favoring private dispute-solving mechanisms. *See Local 174, Teamster's Union v. Lucas Flour,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

21. The Court reached this conclusion while analyzing the case on the hypothesis that it involved only representational issues. *See* 375 U.S. at 268, 84 S.Ct. 401. This conclusion clearly refutes the Board's premise, discussed earlier, *see* note 15 *supra* and accompanying text, that it alone may adjudicate disputes involving unit issues. Further, inasmuch as the present case involves a complex of contractual and representational issues, it presents an even more compelling case for the propriety of arbitration than the case that the Supreme Court, by hypothesis, decided in *Carey.*

On its facts, of course, *Carey* simply held that the state courts had power to compel contractually authorized arbitration even as to matters that, in whole or in part, implicate representational issues. Nonetheless, its holding that the state courts could compel resort to the contractually authorized arbitral process is incompatible with the Board's holding in this factually indistinguishable case that consensual resort to that process entails three unfair labor practices.

Despite the Board's failure either in its opinion or in its brief in this case to cite *Carey*, we find the Supreme Court's encouragement of arbitration in that case persuasive. At the time Local 588 invoked the use of the contractual grievance-arbitration procedure, a resulting private, consensual resolution of the strictly contractual matters involved could have aided the disputants in resolving their disagreement fully without resort to the Board, or at least could have reached a conclusion necessary to allow the Board's subsequent determination of the unit questions to end the dispute in its entirety. Further, acting when and as it did, Local 588 implied no disrespect for any recent and clearly controlling Board disposition of the unit questions involved, nor did it, by either picketing or striking or threatening to do so, seek to force Raley's to engage in dispute resolution procedures that can at best reach only provisional results insofar as the Board's ultimate authority over the bargaining unit is concerned. Finally, even in seeking arbitration of a contract question that might, at least as between Local 588 and the employer, have an impact upon the unit issue, Local 588 acted well within the area of appropriate and, in fact, preferred private dispute resolution that the Supreme Court staked out in *Carey*.

Under these circumstances, we cannot say that Local 588 restrained, coerced or discriminated against employees or sought to cause Raley's to do so within the meaning of sections 8(b)(1)(A) and 8(b)(2), nor did it, within the meaning of section 8(b)(3), refuse to bargain collectively with Raley's over an appropriate unit. Accordingly, we set aside the Board's order.

*It is so ordered.*