**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STEVENS FORD, INC., and Stevens Lincoln-Mercury, Inc., also d/b/a Stevens Chrysler-Plymouth, Respondent.**

**No. 1155, Docket 85–4010.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1985.

Decided Sept. 20, 1985.

---

John F. Welsh, Atty., N.L.R.B., Washington, D.C. (Collis Suzanne Stocking, Atty., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

William E. Fitzgerald, Manchester, Conn. (Stephen T. Penny, Manchester, Conn., of counsel), for respondent.

Before MESKILL, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The National Labor Relations Board ("Board") seeks enforcement of an order to bargain, 272 NLRB No. 141, 17 L.R.R.M. (BNA) 1404 (1984), the most recent step in a six-year struggle between Stevens Ford, Inc. and Stevens Lincoln-Mercury, Inc. (collectively "Stevens"), and Local 376 of the United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW"). In March, 1979, the UAW won a representation election held among the service employees of Stevens Ford, Inc. That victory spawned further proceedings before the NLRB as well as a prior appeal to this court. We now review the Board's findings that Stevens has unlawfully refused to bargain with the UAW as the representative of the employees of an expanded bargaining unit. We deny enforcement because one group of employees was improperly "accreted" into the bargaining unit. However, we order bargaining with respect to the other employees in the unit.

### BACKGROUND

Because Stevens' corporate and geographic structure has been the source of much confusion in this case, we begin with a general description of the businesses involved and of the role the pertinent groups of employees now play. Two commonly owned corporations constitute the employer. One is Stevens Ford, Inc., which has Ford and Dodge franchises. It has a showroom and service facilities at 717 Bridgeport Avenue, Milford, Connecticut. The other is Stevens Lincoln-Mercury, Inc., which has Lincoln-Mercury and Chrysler franchises. It has a showroom and service facilities at 739 Bridgeport Avenue. The two dealerships are adjacent to each other.

At issue are two groups of employees who service and repair motor vehicles. One works for Stevens Ford, Inc. at 717 Bridgeport Avenue, the other for Stevens Lincoln-Mercury, Inc. at 739 Bridgeport Avenue. It must be emphasized that the corporate titles are misleading. "Ford" and "Lincoln-Mercury" are brand names for products manufactured by Ford; "Chrysler" and "Dodge" are brand names for products manufactured by Chrysler. Each corporation thus uses a Ford brand in its corporate name although each also sells Chrysler cars. This results from a fact of life of automobile manufacturing and distribution. Although autos produced by a manufacturer under different brand names often have numerous common features not shared with cars made by different manufacturers, they are often not displayed and sold in the same showroom. In fact, differences between cars of different companies may complement each other so far as sales are concerned. Thus it is not uncommon for showrooms to display cars of different manufacturers, e.g., Ford and Dodge or

Lincoln-Mercury and Chrysler, as in the case of the two Stevens operations.

Different features resulting from multiple manufacturers are not complementary where servicing and repair are concerned, however, because it is easier to service cars with the common features of a single manufacturer. As a result, the cars serviced and repaired at 717 and 739 Bridgeport Avenue correspond only in part to the new cars sold at each location. Warranty service and repairs on Ford and Lincoln-Mercury cars are done at 717 Bridgeport Avenue, while warranty work on Dodge and Chrysler products is done at 739 Bridgeport Avenue.

The service employees at 717 Bridgeport Avenue thus are paid by Stevens Ford, Inc. but service and repair Lincoln-Mercury vehicles sold by Stevens Lincoln-Mercury, Inc. as well as Ford vehicles sold by Stevens Ford, Inc. The service employees at 739 Bridgeport Avenue, on the other hand, are paid by Stevens Lincoln-Mercury, Inc., but they service and repair Dodge vehicles sold by Stevens Ford, Inc. as well as Chrysler vehicles sold by Stevens Lincoln-Mercury, Inc. Thus, the "Lincoln-Mercury service employees" work for Stevens Ford, Inc. while the "Chrysler service employees" work for Stevens Lincoln-Mercury, Inc. Having delineated these distinctions, which were not always observed during the proceedings before the Board, we now turn to a chronological review of the facts.

Before 1980, the Lincoln-Mercury service employees were located at 739 Bridgeport Avenue, and Stevens Lincoln-Mercury, Inc. sold cars only of that brand name. In March, 1979, the NLRB held a representation election among the service department and maintenance employees of Stevens Ford, Inc. employed at 717 Bridgeport Avenue. When this agency acquired the Dodge franchise is not clear in the record. The Lincoln-Mercury service employees at the 739 address were excluded from the election.

The election tally was nine votes for the union, nine votes against, and three challenged ballots. The acting regional director recommended that two of the three challenged ballots be thrown out. The Board sustained the challenges to the two ballots and ordered the third opened and counted. That ballot was for the union, and the regional director certified the UAW as the Ford service employees' bargaining representatives. The certification described the bargaining unit as "[a]ll service and maintenance employees ... employed by the Employer at its 717 Bridgeport Avenue ... location...." *Stevens Ford, Inc.*, 257 N.L.R.B. 528, 529 (1981).

In February, 1980, while the result of the election was being contested before the NLRB, Stevens moved the Lincoln-Mercury service department from 739 Bridgeport Avenue to 717 Bridgeport Avenue, a consolidation compelled by the poor financial condition of the Lincoln-Mercury dealership. Six Lincoln-Mercury service employees thus moved to 717 Bridgeport Avenue. By that time, the number of Ford mechanics had been reduced to seven. Later that year, however, Stevens Lincoln-Mercury, Inc. acquired a Chrysler-Plymouth franchise, which opened in January, 1981, at 739 Bridgeport Avenue. In connection with the new franchise, service employees were hired to work at that location. (Lincoln-Mercury vehicles were still sold there.)

On October 8, 1981, the union filed a unit clarification petition with the NLRB, 39–UC–20, seeking to have the Lincoln-Mercury service employees (now at 717 Bridgeport Avenue) included in the bargaining unit. A hearing was held at which most of the evidence related to the status of those employees. The union also claimed at the hearing, however, that the bargaining unit should include the Chrysler service employees located at 739 Bridgeport Avenue because their duties overlapped those of the Ford service employees. Only a small portion of the testimony, however, was relevant to the Chrysler service employees. Nevertheless, the regional director issued a decision clarifying the unit to include "all service and maintenance employees employed by the Employer at its 717 Bridgeport Avenue and 739 Bridgeport Avenue

locations." The decision discussed the intermingling of the Lincoln-Mercury and Ford service employees at 717 Bridgeport Avenue and mentioned the fact that a small portion of the Ford service work was being performed at 739 Bridgeport Avenue. The regional director's decision made no specific mention of the Chrysler service employees other than a reference to the 739 Bridgeport Avenue address. Indeed, the word "Chrysler" does not appear in that decision.

On February 8, 1982, the Board declined to review the regional director's decision, stating that the decision raised "no substantial issues warranting review...." Member Hunter dissented, without stating his reasons.

In May, 1982, Stevens began negotiations with Local 376. These quickly broke down, however, because of the presence of a Chrysler service worker on the union negotiating committee. Stevens took the position that the unit clarification order did not include the Chrysler service employees. It offered to negotiate if the union would agree that the presence of a Chrysler employee on the negotiating committee was not a waiver of Stevens' position as to the composition of the bargaining unit. No such agreement was forthcoming.

Local 376 also demanded that Stevens provide job descriptions, titles and wage rates for the Chrysler employees, a request with which Stevens refused to comply, again because of the controversy over the bargaining unit. The union thereupon filed unfair labor practice charges with the Board.

On March 8, 1984, an administrative law judge ("ALJ") decided that: (i) the Stevens dealerships were an integrated business; (ii) the unit clarification had added the Chrysler service employees to the unit; and (iii) Stevens' refusal to negotiate because of the presence of a Chrysler employee at the negotiation meetings and refusal to provide employment data about the Chrysler employees were unfair labor practices, in violation of 29 U.S.C. § 158(a)(1), (a)(5) (1982).

The ALJ thereupon ordered Stevens to cease and desist from refusing to bargain with Local 376 and from refusing to provide wage and hour information on the Chrysler employees. The ALJ also ordered Stevens to post the usual notices attendant upon unfair labor practices. On October 23, 1984, the Board adopted the ALJ's decision. 272 NLRB No. 141, 17 L.R.R.M. (BNA) 1404 (1984). Member Hunter dissented on the grounds that the hearing on the unit clarification petition was procedurally flawed because it had not been delayed to permit Mr. Stevens to attend, as he had requested.

The Board now seeks enforcement of its orders.

## DISCUSSION

1. *The Accretion of the Chrysler Service Employees*

As usual, the Board emphasizes its broad discretion in determining the appropriateness of bargaining units. *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (*per curiam*). We respect that discretion when it is exercised after reflective consideration of a properly developed record in light of the relevant policies of the Act and of precedent. Where, however, as in the present case, the Board draws erroneous conclusions from an inadequate record, in contravention of basic policies of the Act, and contrary to relevant precedent, including its own, deference to administrative discretion has no place in judicial review.

We believe the present case involves a patent misuse of what is known as the accretion doctrine. Under that doctrine, groups of new employees, or present employees in new jobs, can be added to an existing bargaining unit without holding a vote on their representation. *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1030 (2d Cir. 1980); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 682 (2d Cir.1971); *NLRB v. Security-Columbian Banknote Co.*, 541 F.2d

135, 140 (3d Cir.1976). Essentially, the doctrine is designed to preserve industrial stability by allowing adjustments in bargaining units to conform to new industrial conditions without requiring an adversary election every time new jobs are created or other alterations in industrial routine are made.

■ However, because the accretion doctrine generally imposes a bargaining representative on employees without an election, it should be employed restrictively, with close cases being "resolve[d] ... through the election process," *Westinghouse Electric Corp. v. NLRB*, 440 F.2d 7, 11 (2d Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971); *see also Towne Ford Sales*, 270 N.L.R.B. No. 55, NLRB Dec. (CCH) ¶ 16,279 (1984), *enf'd*, 759 F.2d 1477 (9th Cir.1985); *Kaynard*, 633 F.2d at 1030; *Local 627, International Union of Operating Engineers v. NLRB*, 595 F.2d 844, 850–851 (D.C.Cir.1979); *Security-Columbian Banknote*, 541 F.2d at 140; *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 795–97 (5th Cir.1973); *NLRB v. Food Employers Council, Inc.*, 399 F.2d 501, 505 n. 1 (9th Cir.1968); *Melbet Jewelry—Orchard Park*, 180 N.L.R.B. 107, 109–10 (1969).

■ The criteria used to determine whether employees should be accreted into an existing bargaining unit without an election include the usual factors relating to unit determinations involving two groups of employees: geographic proximity, similarity of skills and functions, similarity of conditions of employment, centralization of the employer's administration, managerial and supervisory control, interchange between the employees, functional integration of the employer, and bargaining history. *See, e.g., Universal Security Instruments, Inc. v. NLRB*, 649 F.2d 247, 253–54 (4th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *United Food and Commercial Workers*, 267 N.L.R.B. 891, 894–95 (1983); 18C T. Kheel, *Business Organizations: Labor Law* § 14.02[5], at 14–36 to –38 (1984).

■ Because accretion occurs without an election, however, factors not generally considered in unit determinations must also be taken into account. One such factor is whether the group of employees to be accreted constitutes an appropriate unit. *See NLRB v. Retail Clerks Local 588*, 587 F.2d 984, 986–87 (9th Cir.1978); *Retail Clerks Local 588 v. NLRB*, 565 F.2d 769, 772 (D.C.Cir.1977). If not, it seems clear that that group ought to be part of the existing unit for unit determination purposes, and the sole question is whether, when it is added, the majority status of the bargaining representative is cast into doubt. When such doubt does not exist, considerations of convenience suggest that accretion may occur without an election.

■ Where a group of employees constitutes an appropriate unit on its own, however, different considerations apply. In those circumstances, the employees have the option of "going it alone," with or without a bargaining representative, and there is no reason not to allow them to exercise that choice. An election thus registers the preferences of the group to be accreted and insures that its addition does not destroy the majority status of the union in the enlarged unit. For these reasons, courts have held that accretion may occur only when the accreted group does not constitute an appropriate unit. *NLRB v. Retail Clerks Local 588*, 587 F.2d 984, 987 (9th Cir.1978); *Retail Clerks Local 588 v. NLRB*, 565 F.2d 769, 772 (D.C.Cir.1977).

■ Another factor unique to accretion cases is the size of the group to be accreted relative to the size of the existing unit. *See Universal Security Instruments*, 649 F.2d at 255; *Local No. 3–193 International Woodworkers v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1299–1300 (9th Cir.1980); *Spartans Industries, Inc. v. NLRB*, 406 F.2d 1002, 1005 (5th Cir.1969); *Auto Processing Co.*, 258 N.L.R.B. 854, 859 (1981); *Servair, Inc. and Servair Maintenance, Inc.*, 252 N.L.R.B. 670, 675 (1980); *Renaissance Center Partnership*, 239 N.L.R.B. 1247, 1247–48 (1979); *The Wackenhut Corp.*, 226 N.L.R.B. 1085, 1089 (1976).

This is of crucial importance since the larger the size of the accreted group relative to the unit, the more doubt there is as to the wishes of the employees in the enlarged unit.

■ Bargaining representatives are presumed to have a continuing majority in an existing unit, absent a showing of doubt about that status. *NLRB v. Alvin J. Bart & Co.*, 598 F.2d 1267, 1271 (2d Cir.1979). This presumption has a basis in part in logic and experience. It also has a basis in national labor policy in that it enhances industrial stability by obviating the need for continuous monitoring of employees' views or for determining the wishes of each new employee. When a new group of employees is added *en masse* to an existing unit without an election, however, there is no reason to presume the bargaining representative's majority status among the new group, and the logical strength of the presumption of a continuing majority in the unit as a whole is weakened. Where the accreted group is small relative to the unit, the danger of the accretion resulting in overall minority status is minimal. Where the size of the accreted group is relatively large, however, the danger of minority status in the enlarged unit is greater. The need to determine the views of the group to be accreted thus varies directly with its size relative to the existing unit.

■ Another factor—one which is often dispositive—is whether the group to be accreted was in existence at the time the existing bargaining unit was recognized. If the group was in existence and excluded from an election, then accretion should not normally be permitted. *See, e.g., Horn & Hardart*, 439 F.2d at 682; *King Radio Corp.*, 257 N.L.R.B. 521, 526 (1981) ("the single, overriding factor in any accretion case is 'whether the group sought to be accreted has been in existence at the time of recognition or certification, yet not covered in an ensuing contract, or, having come into existence, has not been part of the larger unit to which their accretion is sought'") (quoting *Laconia Shoe Co.*, 215 N.L.R.B. 573, 576 (1974)); *Desert Palace, Inc.*, 209 N.L.R.B. 950 (1974).

The relevance of this factor is obvious. If groups of employees may be permissibly accreted to a bargaining unit after they have been earlier excluded from an election in that unit, strategic selection of one group for election purposes followed by accretion will lead to a larger bargaining unit in which the bargaining representative does not have majority status. Such bootstrapping violates the Act's policies favoring the free choice of employees.

■ Another factor unique to unit determination by accretion is derived from the factors previously discussed. Repeated accretions to a single unit create the danger both of loss of majority status in the overall unit and of the kind of expansion by bootstrapping described above. The extent to which an existing unit is the result of prior accretions must thus be considered before a further accretion is permitted. Where a substantial portion of the unit is the result of prior accretions, further additions should be allowed only after an election.

Finally, evidence of the views of the employees subject to accretion is relevant. *See United States Food and Commercial Workers*, 267 N.L.R.B. 891, 894 (1983); *Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352, 1357 (9th Cir.1970). Such evidence is usually available where two unions are engaged in competing organizing efforts, *see, e.g., Kaynard*, 633 F.2d at 1032; *Local 620, Allied Industrial Workers v. NLRB*, 375 F.2d 707, 711 (6th Cir.1967); *Local 814, International Brotherhood of Teamsters*, 223 N.L.R.B. 527, 530 (1976), but may exist in other cases as well.

■ We turn now to a review of the Board's decision in the present case in light of the above discussion. This review has been hampered by the quality of the record and findings below. Although the regional director's decision in the unit clarification proceeding is the linchpin in the various decisions of the Board now before us, he failed to make explicit findings about the

Chrysler service employees. Indeed, virtually all of the evidence then in the record related to the Lincoln-Mercury service employees at 717 Bridgeport Avenue. Only fourteen pages of the 185-page transcript refer to the Chrysler service employees, although somewhat more extensive evidence was introduced in the unfair labor practice proceeding in an after-the-fact effort to bolster the regional director's prior decision. Moreover, despite the vital importance of recognizing the distinctions between the Lincoln-Mercury/Ford and Chrysler/Dodge service employees, the decisions of the regional director and the ALJ, and the Board's brief on appeal, frequently rely on testimony about the Lincoln-Mercury service employees to prove facts about the Chrysler service employees.

Applying the legal criteria governing use of the accretion doctrine, we look first to the factors common to unit determinations generally. A number of facts do support the Board's decision. Stevens Ford, Inc. and Stevens Lincoln-Mercury, Inc. are jointly owned, conduct joint advertising, are managed by the same general manager, and have integrated accounting and sales operations. The dealerships are next door to each other and similar skills are used by both groups of service employees. The skills are not, however, completely identical, since Chrysler and Ford cars are sufficiently different that not all skills learned in repairing one are automatically transferable to the other.

Other facts undermine the Board's decision in the present case and demonstrate that it is not readily reconcilable with Board decisions in similar cases. While the Stevens dealerships are integrated in many aspects, the service departments are less so. The Board has held this fact to be decisive in denying accretion in other cases. In *Towne Ford Sales,* the Board found inappropriate the accretion of a group of mechanics at a new dealership to an existing unit of mechanics at a related dealer, even though "Towne Ford Sales and Town Imports have common offices, common ownership, and common management at the policymaking level. The two enterprises engage in joint advertising and have a joint salesmen corps. Their president formulates the labor policies affecting the employees of both companies." 270 N.L.R.B. No. 5, 1984 NLRB Dec. (CCH) ¶ 16,279, at 27,831 (1984). There is of course no "Chinese wall" between Stevens' two service departments, but the interaction which exists is distinguishable from *Towne Ford.* In that case, for example, "Town Imports mechanics use some of Towne Ford Sales equipment and tools and Towne Ford mechanics occasionally work on Town Import cars." *Id.*

There are also significant differences in conditions of employment between the Chrysler and Ford/Lincoln-Mercury employees, which, under prior Board decisions, have been held to be evidence of lack of a community of interest. *Westwood Import Co.,* 251 N.L.R.B. 1213, 1221 (1980), enf'd, 681 F.2d 664 (9th Cir.1982). Most significantly, the Chrysler mechanics are paid strictly by the hour while Local 376's mechanics are paid pursuant to an incentive plan.

In addition, the Ford/Lincoln-Mercury and Chrysler service departments have different supervisors. These supervisors exercise day-to-day authority over their respective departments and have the authority to hire and fire. The Board has stated in the past that where the supervisors of different groups of employees have significant discretion over the employees, accretion is disfavored, even where overall management policy is centralized. *Kaynard,* 633 F.2d at 1032 (quoting *Bryan Infants Wear Co.,* 235 N.L.R.B. 1305, 1306 (1978)); *Save-It Discount Foods, Inc.,* 263 N.L.R.B. 689, 693–94 (1982). "[T]he day-to-day problems and concerns among the employees at one location may not necessarily be shared by employees who are separately supervised at another." *Towne Ford Sales,* 1984 NLRB Dec. at 27,832. The Board has voiced such views even in cases where the supervisors did not have the ultimate power to hire and fire. *See, e.g., Save-It-Discount Foods, Inc.,* 263 N.L.R.B. at 694.

There also appears to be little interchange of employees between the two Stevens service departments. No non-supervisory service personnel have been transferred between those departments since shortly after the Chrysler service department was started. Such lack of interchange has in prior cases weighed very heavily against accretion. *Towne Ford Sales*, 1984 NLRB Dec. at 27,832; *Mac Towing, Inc.*, 262 N.L.R.B. 1331, 1334 (1982); *Combustion Engineering, Inc.*, 195 N.L.R.B. 909, 912 (1972).

We have grave difficulty, therefore, in reconciling the Board's decision in the instant case with other decisions of the Board, particularly *Towne Ford*. We need not pursue that question further, however, since it is clear for other reasons that accretion here is wholly impermissible.

For example, it is clear that the Chrysler service employees themselves constitute an appropriate unit since they are, as a group, indistinguishable from the Ford service employees who were held to constitute an appropriate unit for the 1979 election. As discussed *supra*, this alone is a sufficient ground for denying accretion.

In addition, although the record is unclear as to the precise numbers involved, the Chrysler employees are a very sizeable group relative to the bargaining unit. At the time of the unfair labor practice hearing, they may have been nearly as numerous as the Ford/Lincoln-Mercury service employees. Moreover, when the Lincoln-Mercury employees moved to 717 Bridgeport Avenue, they appear to have been nearly as numerous as the Ford service employees in the original unit. Because they have also been accreted, a ruling we must assume to be valid because Stevens does not challenge it, a second sizeable accretion would lead to a unit in which the only election held would be virtually irrelevant to the present majority status of the bargaining representative.

Furthermore, the Chrysler service employees are the functional equivalent of the Lincoln-Mercury employees who were located at 739 Bridgeport Avenue at the time of the original election and who were ex-

cluded. After the election, Local 376 represented only those service employees at 717 Bridgeport Avenue. It accreted the Lincoln-Mercury employees to the unit only after they were moved to 717 Bridgeport Avenue. Less than a year after the Lincoln-Mercury employees moved, however, the Chrysler service employees were hired to work at 739 Bridgeport Avenue. We believe that for purposes of the accretion doctrine they should be treated as a group which has been consciously excluded from the prior election. *See Horn & Hardart*, 439 F.2d at 682; *King Radio Corp.*, 257 N.L.R.B. at 526.

Finally, we look to evidence of the views of the employees to be accreted. The only such evidence in the record is that during a nine-week strike by Local 376 beginning in February, 1983, nine of eleven Chrysler service employees reported for work. Such abstention may not necessarily be proof of hostile sentiment toward Local 376, but it does cast serious doubt on any claim that the Chrysler employees desire accretion.

There is, therefore, no legal or factual basis for application of the accretion doctrine.

### 2. *The Remedy*

We face a somewhat unusual situation in fashioning a remedy. Stevens agreed to negotiate with Local 376 as to the Ford and Lincoln-Mercury employees who work at 717 Bridgeport Avenue if the union would agree that the Chrysler service employees at 739 Bridgeport Avenue were not in the unit. The union would not agree. We believe that Stevens was not obliged to bargain in such circumstances and that the lack of such an obligation further justified its refusal to provide employment data about the Chrysler employees. Stevens did not, therefore, commit an unfair labor practice.

The normal course would be to remand to the Board for further proceedings. We choose not to follow this course, however, since it is clear that Stevens' other claims of error are meritless and that it has a

legal obligation to bargain with the Ford and Lincoln-Mercury service employees employed at 717 Bridgeport Avenue. Experience also teaches that a remand to the Board would result in protracted delay in the enforcement of this obligation. *See Dow Chemical Co. v. NLRB*, 636 F.2d 1352 (3d Cir.1980) (declining to remand to Board because, *inter alia*, nine years had passed since events in issue), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981). We intend, therefore, to issue an order directing Stevens to bargain, although the requirement as to notice posting that accompanies unfair labor practice findings will be omitted.

The order will direct bargaining with the service employees located at 717 Bridgeport Avenue. The union may select its own bargaining committee, including Chrysler service employees, *General Electric Co. v. NLRB*, 412 F.2d 512, 517 (2d Cir.1969), even though they do not represent persons outside the unit and the bargaining will not affect the service employees at 739 Bridgeport Avenue. Stevens must further provide the requested employment data on employees outside the unit because it is relevant to the negotiations with the employees at 717 Bridgeport Avenue. *Press Democrat Publishing Co. v. NLRB*, 629 F.2d 1320, 1325–26 (9th Cir.1980).

The parties are to attempt to agree on an order consistent with this opinion. If agreement is not reached, each shall submit a proposed order within fifteen days of this opinion.